[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1221 
This is an appeal by J.M. and Ben Touchstone, defendants-appellants, from an adverse judgment in an ejectment action brought by Rosa Lee Peterson, plaintiff-appellee. We reverse and remand.
In July 1953, appellant J.M. Touchstone purchased from Joe M. Pelham and his wife the ten-acre tract of land which is the subject of this dispute and went into possession of the ten acres at that time. Appellant Ben Touchstone began living with his brother, J.M., in August 1954, and both have continued in possession of the property since that time. On October 5, 1955, J.M. Touchstone sold by warranty deed these ten acres of land to Randolph and Uhbern Kirkland, intending to reserve for himself a life estate in the property. The deed, however, did not contain this reservation as, it was later discovered by the parties, such omission being the result of an error made by the scrivener who prepared the deed. Despite this fact, a correction deed was never executed, since J.M. Touchstone and the Kirklands had orally agreed and understood at the time of the sale that J.M. Touchstone had reserved the right for himself and Ben to live on the property for their lives. Accordingly, J.M. Touchstone, relying upon this oral understanding, failed to have the deed corrected.
On February 13, 1956, Randolph Kirkland married Rosa Lee Peterson, the plaintiff-appellee in this case. On March 13, 1969, Uhbern Kirkland and his wife conveyed all their interest in the disputed ten-acre tract by warranty deed to Randolph Kirkland. Although this deed again failed to mention J.M. Touchstone's life interest in the property, there was an oral reaffirmation of his rights between the Kirklands and J.M. Touchstone.
On January 10, 1977, Rosa Lee Peterson and Randolph Kirkland were divorced. Pursuant to the terms of the divorce decree, she was awarded the disputed ten-acre tract; however, it was not until May 2, 1979, that the register's deed conveying the property to Peterson was executed and delivered to her. Sometime in January 1977, after the divorce decree was entered, Rosa Lee Peterson visited the home of J.M. and Ben Touchstone, advised them she had been awarded the ten acres on which they resided, and requested that they move from the property. They refused to do so. Two and one-half years later, on May 2, 1979, Peterson gave J.M. Touchstone notice by registered letter to vacate the premises within ten days. When the Touchstones again failed to vacate, upon proper complaint filed by Peterson, the District Court of Washington County issued a writ of ejectment on June 12, 1979. A hearing was held on the ejectment complaint in the district court on October 23, 1979, after which judgment was entered against the Touchstones. Thereafter, the Touchstones appealed to the Circuit Court of Washington County wherein they filed a counterclaim against Peterson, seeking reformation of the deed given to Peterson's predecessor in title (her ex-husband Randolph Kirkland) by J.M. Touchstone, so as to reflect the life interest in the ten acres reserved by J.M. Touchstone, the original grantor. In Peterson's answer to this counterclaim, she set up the special defense of laches, among other things. She also amended her complaint to add a claim for unlawful detainer.
At trial, on February 24, 1982, evidence on the counterclaim for reformation was presented ore tenus to the circuit court. Thereafter, on March 11, 1982, the court entered an order denying reformation of the deed in question, finding such reformation barred by the doctrine of laches, and also under Code of 1975, § 35-4-153, that reformation would result in prejudice to rights acquired by a third person in good faith and for value. The ejectment and unlawful detainer claims were then tried to a jury on March 30, 1982, and, at the conclusion of trial, a verdict was returned in favor of Peterson. Prior to the time the circuit court entered judgment on the verdict, *Page 1222 
the Touchstones filed motions for rehearing and for a new trial or, in the alternative, for judgment notwithstanding the verdict. Subsequently, on January 18, 1983, the court entered judgment on the verdict for Peterson, and on February 24, 1983, after the Touchstones refiled their motions for rehearing and for a new trial or, in the alternative, for judgment notwithstanding the verdict, these motions were denied by the circuit court. It is from the denial of these motions that the Touchstones appeal.
The controlling issue raised by the Touchstones on appeal is whether the circuit court erred in denying the Touchstones' counterclaim for reformation. The first question presented is whether the circuit court correctly found Rosa Lee Peterson to be a bona fide purchaser for value under § 35-4-153, i.e., that she was a purchaser of legal title without actual knowledge of the Touchstones' prior equity, or that she did not have knowledge of facts sufficient to put her on inquiry regarding the Touchstones' prior equity before or at the time she was granted the property by the divorce decree or when she later received the deed to the property.
Section 35-4-153 provides as follows:
 "When, through fraud, or a mutual mistake of the parties, or a mistake of one party which the other at the time knew or suspected, a deed, mortgage or other conveyance does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention, insofar as this can be done without prejudice to rights acquired by third persons in good faith and for value." (Emphasis added.)
In order to reform the deed to express the intentions of the parties thereto, under § 35-4-153, the Touchstones have the burden of proving with clear, convincing, and satisfactory evidence that the intention they seek to substitute was that of both parties to the deed. Fidelity Service Ins. Co. v. A.B.Legg Sons Burial Ins. Co., 274 Ala. 94, 145 So.2d 811 (1962);Taylor v. Burns, 250 Ala. 218, 34 So.2d 5 (1948); Hyatt v.Ogletree, 31 Ala. App. 8, 12 So.2d 397 (1942).
All the parties to both deeds in question (the 1955 deed from J.M. Touchstone to Uhbern and Randolph Kirkland, and the 1969 deed from Uhbern Kirkland to Randolph Kirkland) were properly joined and testified at trial. It is clear from their testimony, taken together, that all of the parties to both deeds orally agreed and understood that J.M. Touchstone retained a life interest in the ten-acre tract and have since acted upon this understanding. The testimony was uncontroverted as to this intention and it was uncontroverted that a defect in the deed existed due to the omission of the life estate. The only conflicting testimony had to do with when the defect in the original deed from J.M. Touchstone to Randolph and Uhbern Kirkland was discovered. Thus, the Touchstones have met their burden of proving that the intention they seek to substitute was that of all parties to the deeds in question. The only remaining issue, under the language of § 35-4-153, supra, is whether Peterson obtained bona fide purchaser status in acquiring her rights in the subject ten acres.
The portion of the statute italicized above codifies the rule of law long recognized in this state: a written instrument is not subject to reformation as against the rights of a bona fide purchaser, without notice, and for value. Reformation or correction of a written instrument will generally be granted, however, as against subsequent purchasers who obtain their title or lien with notice of the existing equitable right to reformation. Gilmore v. Sexton, 254 Ala. 560, 49 So.2d 157
(1950); Walling v. Moss, 240 Ala. 87, 197 So. 30 (1940);Copeland v. Warren, 214 Ala. 150, 107 So. 94 (1926). As explained by this Court in Lightsey v. Stone, 255 Ala. 541,546, 52 So.2d 376, 381 (1951):
 "In order to constitute one a bona fide purchaser and entitle him to the protection of the rule, as against a prior equity or conveyance, it is essential: `* * * (1) *Page 1223 
that he is the purchaser of the legal as distinguished from an equitable title; (2) that he purchased the same in good faith; (3) that he parted with value as a consideration therefor by paying money or other thing of value, assuming a liability or incurring an injury; (4) that he had no notice, and knew no fact sufficient to put him on inquiry as to complainant's equity, either at the time of his purchase, or at, or before the time he paid the purchase-money, or otherwise parted with value * * *.' Craft v. Russell, 67 Ala. 9, 12, and cases cited. . . ."
Accord, First National Bank of Birmingham v. Culberson,342 So.2d 347 (Ala. 1977); Murphree v. Henson, 289 Ala. 340,267 So.2d 414 (1972).
The first element enumerated above is that the purchaser acquire the legal title to the property; this element, read together with the fourth element, would require the purchaser to obtain legal title to the property before he had actual knowledge of a prior equity, or learned of facts sufficient to put him on inquiry concerning the complainant's equity. Peterson testified at trial that it was not until January 1977, after the divorce decree was entered granting her the ten acres, that she learned of the Touchstones' claim to a life interest in the property. The following testimony by Peterson to this effect was elicited at trial by her attorney on direct examination:
 "Q. Did you have any discussions after you got the divorce with the Touchstones?
"A. Yes.
 "Q. All right. Did ya'll ever have any discussions about this land?
"A. Yes.
 "Q. All right. Can you tell me at what point in time you had the discussions?
 "A. Well, it was in January of '77. I went and told them that I would like for them to move because I was going to move the house from the property and have it torn down and moved because I planned to have my land pushed off because I was building me a house and this house they lived in is between my house and the road, and I planned to clear the land between my house and the road and I would like to move the house.
 "Q. In relationship to the divorce, was that after or before?
"A. That was after.
"Q. After the divorce.
"A. Uh-huh.
"Q. Had you got that deed yet?
"A. No.
 "Q. How long a period of time was it from the time you got your divorce until you actually got the deed out from Randolph?
 "A. Well, I got my divorce the tenth day of January and May the second of 1979, I finally got my deed.
"Q. Better than two years later?
"A. Yes.
 "Q. Now, when you went to the Touchstones on that occasion, did they make any statements to you concerning the deed from them to the Kirklands — Randolph and Uhbern?
"A. No, not the deed.
 "Q. All right. What did they tell you, if anything, on that occasion when you asked them to move, that you wanted to push your land —
"A. They just said they had a right to live there.
"Q. They had a right to live there?
 "A. That it was a verbal agreement that they had a right to live there.
 "Q. That there was a verbal agreement. Was there any time in that conversation the subject of this old deed that was made that was supposed to be a reservation of some sort of right to live or life estate in?
"A. No, there was no such conversation.
". . . .
 "Q. During your marriage, did you and Randolph ever have any discussions about an error in a deed or about an oral agreement to allow them to live on the land?
"A. No, we never discussed it. *Page 1224 
 "Q. When is the first instance, if there is any, when your husband might have brought to your attention that there was some `right' that the Touchstones had?
 "A. Well, it was the week following the divorce. He called me.
"Q. Are you talking about January of '77.
"A. Right.
"Q. All right. Who called you?
"A. He called me and informed me that —
"Q. Who called you?
"A. Randolph.
"Q. Okay.
 "A. The water pump at the house where I was living was on his property.
"Q. Where were you living at the time?
 "A. I was living in the house that I got, on the five-tenths of an acre, right down under the hill from where he lived.
 "Q. All right. Would that be in a different location?
"A. That's a different location
 "Q. All right. What else if anything did he tell you?
 "A. And then he told me, and by the way, I guess you know that J.M. and Ben are supposed to live there. And I said, no, I didn't. And he said, well, that's your problem.
 "Q. Is that the first occasion you had ever become aware of any right from your husband that the Touchstones had?
"A. Yes."
It is significant to her status as a bona fide purchaser that she learned of the Touchstones' claim prior to the time the register's deed to the ten acres was executed and delivered to her on May 2, 1979. It is also significant to point out that it was not until after she received the deed on May 2, 1979, that approximately one week later, on May 7, she served the Touchstones notice to vacate on the Touchstones, and subsequently petitioned the district court for a writ of ejectment on June 12, 1979 — an action which can only be brought by the record owner of the disputed property. Therefore, when the divorce decree was entered, Peterson acquired only an equitable title to the subject ten acres; it was not until the register's deed was executed and delivered to her that her equitable title "ripened into a full legal title as against all equities and claims not known to her or noticeof which she was not legally chargeable." Larkins v. Howard,252 Ala. 9, 39 So.2d 224 (1949) (emphasis added). In Mallory v.Agee, 226 Ala. 596, 600, 147 So. 881, 883 (1932), this Court explained:
 "In order that a purchaser of land shall be protected against equities of third persons, he must have acquired at the time of such purchase the legal title by warranty deed. . . . `As a mere equity, that he acquires must be subordinate to older equities. . . .' Shorter v. Frazer, [64 Ala. 74 (1879)]" (Citations omitted.)
And, in the earlier case of Manning v. House, 211 Ala. 570,574, 100 So. 772, 775 (1924), this Court, in applying the foregoing principle to the facts in that case, stated:
 "W.E. Manning cannot be considered a bona fide purchaser of lot No. 7 without notice of its dedication. Beside the physical evidences of public use, it sufficiently appears that before his purchase he was advised of the controversy by his vendor, and that the landowners protested to him before he acquired a deed to the property." (Emphasis added.)
Thus, since Rosa Peterson had actual knowledge of the Touchstones' prior equity before acquiring the legal title to the property, she cannot be deemed a bona fide purchaser.
Beyond the element present here of actual notice of prior claims before acquiring legal title, it is apparent that Rosa Lee Peterson would further be deprived of bona fide purchaser status under the constructive notice doctrine as well. Generally, actual notice on the part of the subsequent purchaser of the error to be corrected in the deed is not necessary in order to permit reformation of the instrument as against him, provided he had constructive *Page 1225 
notice, or the facts were such as to put a prudent person on inquiry as to title, charging him with notice of all facts to which diligent inquiry and investigation would have led him.See generally, 79 A.L.R.2d 1180 (1961); Holly v. Dinkins,202 Ala. 477, 80 So. 861 (1919). See also, Leslie v. Click,221 Ala. 163, 165, 128 So. 170, 172 (1930), where this Court stated as follows:
 "A purchaser with sufficient information to stimulate inquiry which would lead to knowledge of adverse or hostile and superior claim or title, and fails therein, the injury is the result of his own folly — he is wanting in good faith, an indispensable element of a purchaser (for value) without notice — and a court of equity will not protect such reckless purchaser. Taylor v. A. M. Ass'n, 68 Ala. 229. . . ."
Accord, Adams v. Adams, 346 So.2d 1146 (Ala. 1977); FirstNational Bank of Birmingham v. Culberson, supra; Murphree v.Henson, supra; Lightsey v. Stone, supra.
Furthermore, it is settled law in this state that, where a purchaser buys land and has knowledge that a third person is in possession thereof, he is charged with notice as to the nature of that party's title, including the occupant's equitable rights. This principle is stated in Holly v. Dinkins, supra, as follows:
 "Whenever a party, dealing as a purchaser or incumbrancer with respect to a parcel of land, is informed or knows, or is in a condition which prevents him from denying that he knows, that the premises are in the possession of a third person, other than the one with whom he is dealing as owner, he is thereby put upon an inquiry, and is charged with constructive notice of all the facts concerning the occupant's right, title, and interest which he might have ascertained by means of a due inquiry. 2 Pom.Eq.Jur. § 615. . . ." 202 Ala. at 479, 80 So. at 863.
Accord, Lightsey v. Stone, supra; Walling v. Moss, supra;Sulzbacher v. Campbell, 219 Ala. 191, 121 So. 706 (1929);Copeland v. Warren, 214 Ala. 150, 107 So. 94 (1926). In Gilmorev. Sexton, supra, reformation of deeds was upheld as against third parties who had purchased the disputed land with notice that it was occupied and possessed by the complainant. There, this Court said that such continued possession is notice of all the equitable and other rights of the possessor. See also,Cumberland Capital Corporation, Inc. v. Robinette, 57 Ala. App. 697, 331 So.2d 709 (1976); Hill v. Taylor, 285 Ala. 612,235 So.2d 647 (1970).
However, to put a purchaser upon inquiry and to operate as constructive notice, possession must exist at the time of the transaction by which his rights and interest were created.Holgerson v. Gard, 257 Ala. 579, 60 So.2d 427 (1952). Such possession must be open, visible, exclusive, and unambiguous, not liable to be misconstrued or misunderstood. Lightsey v.Stone, supra. Nevertheless, in Evans v. Bryan, 202 Ala. 484,485, 80 So. 868, 869 (1919), this Court said:
 "If the possession of the grantor, after making a conveyance, is long continued, it may be more reasonable to refer it to his right to occupancy rather than to the sufferance of the grantee.
Possession, therefore, for an unreasonable period after a conveyance may well be sufficient to put persons upon inquiry as to the occupant's rights." (Emphasis added.)
See also, A. Shiff Son v. Andress, 147 Ala. 690, 40 So. 824,825 (1906), holding that where the complainant continued in possession of land after having been induced to convey the same such possession constituted notice of her equitable rights to purchasers from her grantee.
The evidence in the present case shows the continued possession by the Touchstones of the property in question from 1953 to at least 1979, when the writ of ejectment was issued. During this time, they resided on the property, raised gardens, kept dogs, cut firewood and some timber, and did other acts not inconsistent with their equitable rights in the property. *Page 1226 
Rosa Lee Peterson, by her own testimony, admitted that in 1956, the year of her marriage to Randolph Kirkland, she learned that Ben Touchstone had conveyed the disputed ten acres to her husband, Randolph Kirkland, and his brother Uhbern in 1955. She further testified that she knew the Touchstones had continued to live on the property since before her marriage to Randolph Kirkland through 1977, the year their divorce was granted, and up to the present time, although she never inquired as to the nature of the Touchstones' interest in the property. Apparently she did not inquire as to the Touchstones' rights in the property even during the divorce settlement negotiations when she expressed her interest in receiving the ten-acre tract.
Accordingly, it is clear that she had notice of the continued possession of the property by the Touchstones, and, under the foregoing authorities, she was under a duty of inquiry as to their interest in the property, at least during the divorce settlement negotiations when she assumed the posture of "purchaser for value." Having failed to do so, she is chargeable with an implied notice of everything to which her inquiry would have led, especially the nature of the possessor's interest in the property. Consequently, it cannot be concluded that Peterson, either upon the granting of the divorce decree or upon her subsequent receipt of the register's deed, acquired the rights of a bona fide purchaser. Thus, the trial court erred in denying reformation on the basis of "prejudice to rights acquired by [a third person] in good faith and for value," pursuant to § 35-4-153.
The circuit court further based denial of reformation on its finding that the Touchstones were barred by the doctrine of laches. Lapse of time alone does not establish laches. Dardenv. Meadows, 259 Ala. 676, 68 So.2d 709 (1953); Ellis v.Stickney, 253 Ala. 86, 42 So.2d 779 (1949). To be affected by laches, the delay must have been with notice of the existence of the right, resulting in disadvantage, harm, or prejudice to another, or have operated to bring about changes in conditions and circumstances so that there can no longer be a safe determination of the controversy. Thus, special facts which make the delay culpable must appear. Lipscomb v. Tucker,294 Ala. 246, 314 So.2d 840 (1975); McCary v. Treadway, 289 Ala. 334, 267 So.2d 410 (1972); Merrill v. Merrill, 260 Ala. 408,71 So.2d 44 (1954). Although the evidence shows the Touchstones knew earlier of the mistaken omission from J.M.'s deed, it cannot be said that prejudice has resulted due to their delay in seeking reformation, nor is there any difficulty in determining the controversy in this case.
First, Rosa Lee Peterson cannot be said to have been prejudiced by the Touchstones' delay in seeking reformation, because she does not qualify as a bona fide purchaser. She had ample notice of their continued possession of the property when she acquired the equitable title to the property by way of the divorce decree, and she had actual notice of their equitable claim to a life estate in the property when she acquired the legal title to the property by way of the register's deed. The evidence further indicates that, prior to taking legal title to the property, she was offered other property in lieu of the ten acres encumbered by the Touchstones' claim. Second, since all parties to the deeds in question gave testimony and agreed on the facts surrounding the mistaken omission from the deed of the Touchstones' life interest in the property, and their oral understanding thereof, no doubt is cast over the determination of that controversy.
Moreover, it is a well-settled rule that laches cannot be imputed to one who has all the while been in the peaceable possession of the property with regard to which relief is sought. Hicks v. Huggins, 405 So.2d 1324 (Ala.Civ.App. 1981);Craig v. Root, 247 Ala. 479, 25 So.2d 147 (1946); Fowler v.Alabama Iron Steel Co., 164 Ala. 414, 51 So. 393 (1910). This Court in Fowler, supra, held that where one was in possession of land and asserting his equitable title, or, even if there was no actual possession, was asserting general acts of ownership, he was not guilty of laches in *Page 1227 
not resorting to equity to obtain the legal title before being sued in ejectment. Accord, Woodlawn Development Realty Co. v.Hawkins, 186 Ala. 234, 65 So. 183 (1914). Thus, one who is in peaceable, uninterrupted possession of property is at liberty to wait until his rights in title are attacked without being chargeable with laches. Tarver v. Tarver, 258 Ala. 683,65 So.2d 148 (1953); Ammons v. Ammons, 253 Ala. 82, 42 So.2d 776
(1949).
In the present case, the Touchstones sought reformation of the deeds in question after they had been sued in ejectment. As stated above, they had been in peaceable, continued possession of the presently disputed property for over twenty years prior to the ejectment proceedings. Therefore, their delay was excused and their suit for reformation not barred by laches.
We are mindful of the presumption indulged in favor of the findings and decree of the trial court. Fidelity Service Ins.Co. v. A.B. Legg Sons Burial Ins. Co., supra. However, where, as here, this presumption of correctness is overcome by both the law and the evidence, the decision below is due to be set aside as being plainly and palpably wrong. It is clear that the trial court erred in denying the Touchstones' claim for reformation. Accordingly, we must reverse the judgment and remand the case for further proceedings not inconsistent with this opinion. This being the dispositive issue on appeal, we do not consider that aspect of the appeal relating to the ejectment complaint.
The judgment is reversed and the cause is remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, JONES and SHORES, JJ., concur.